**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |  |
|---|---|---|
| | x | |
| SYLVIA SETTECASI, individually and on behalf of all others similarly situated, | : | Case No. |
| | : | |
| Plaintiff, | : | |
| v. | : | **CLASS ACTION COMPLAINT** |
| | : | |
| | : | <u>**JURY TRIAL DEMANDED**</u> |
| HUEL INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | X | |

   Plaintiff, Sylvia Settecasi (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

   1. This action seeks to remedy the deceptive and misleading business practices of Huel Inc. (hereinafter "Defendant") with respect to the manufacturing, marketing, and sale of Defendant's protein powder products throughout the state of Florida and throughout the country (hereinafter the "Products").

   2. Defendant has improperly, deceptively, and misleadingly labeled and marketed its Products to reasonable consumers, like Plaintiff, by stating, "Crafted using the finest ingredients in nature, we meticulously choose only the highest quality sources, never settling for anything less," "Over 160 health benefits," "A formula you can trust, "and "Third-party tested" in their marketing material. Further, Defendant acknowledges the importance of quality and healthy ingredients:

"First things first – we know that health claims aren't sexy or fun, but science and nutrition are at the heart of what we do at Huel, so it's pretty important that we walk the walk when it comes to talking about how healthy Huel is. Each of the vitamins, minerals, and nutrients in every Huel meal has a role to play in helping your body run smoothly. Each one of these health benefits – and they vary between all the different Huel products – has been scientifically backed and EU-approved, and we've broken them all down so you don't have to."

3.      Defendant's representations omit and fail to disclose to consumers on its packaging that the Products are contaminated with unsafe levels of lead, which is a dangerous neurotoxin that is known to cause cognitive deficits, mental illness, dementia, and hypertension.

4.      The Products' contamination is particularly egregious given the potentially severe and irreversible consequences of lead consumption.

5.      Defendant specifically lists the ingredients in the Products on the labeling; however, Defendant fails to disclose that the Products contain, or are at the risk of containing, lead.

6.      A few representative examples of Defendant's lack of disclosure on the Products are depicted below[1]:



---

[1] https://www.amazon.com/Huel-Nutritionally-Complete-Vitamins-Minerals/dp/B0CP4H76PJ?th=1 (last accessed Dec. 2, 2025)

2

7.      Defendant also markets the Products on its website and social media as "Formulated with *naturally* beneficial *ingredients*" depicted below[2].



8.      The phrase "Formulated with *naturally* beneficial *ingredients*" would be interpreted by any reasonable consumer as a guarantee that the Products are safe to be consumed.

9.      As depicted above, Defendant markets the Products as "Gluten Free." Additionally, Defendant markets the Products as helping muscle function, reduced fatigue, digestive support, and immune support while having "Over 160 health *benefits*," "high in protein," "a source of iron," "a source of calcium," and "a source of vitamin c" as depicted below:

---

[2] https://www.amazon.com/Huel-Nutritionally-Complete-Vitamins-Minerals/dp/B0BF5STD3J?th=1 (last accessed Dec. 2, 2025)

3



10.     Listing all of these health-conscious claims would be interpreted by any reasonable consumer as a guarantee that the Products can be trusted to be safe for consumption and not to contain substances that are harmful such as lead.

11.     Lead is a powerful neurotoxin. There is no safe blood level of lead.[3] Lead consumption has been shown to reduce intelligence, as well as increases the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer.[4]

12.     Consumers, like Plaintiff, trust manufacturers such as Defendant to sell products that are safe and free from harmful known substances, including lead.

---

[3] *CDC – Lead – Tips – Sources of Lead – Folk Medicine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 15, 2013), http://www.cdc.gov/nceh/lead/tips/folkmedicine.htm. (last accessed Dec. 2, 2025)
[4] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure:  A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).

13.     Plaintiff and those similarly situated (hereinafter "Class Members") certainly expect that the food products they purchase will not contain, or are at risk containing, any knowingly harmful substances that cause disease.

14.     Unfortunately for consumers, like Plaintiff, the Products they purchased contained, or were at risk of containing, lead.

15.     On October 24, 2025, the New York Times reported about a study by Consumer Groups, "an independent, nonprofit member organization that works side by side with consumers for truth, transparency, and fairness in the marketplace" indicating that a number of popular protein supplements, including Defendant's Products, contain levels of lead that could pose health concerns.[5] The study stated, "We purchased multiple samples of each product, including two to four distinct lots, over a three-month period beginning last November [2024]. CR bought the products anonymously from a variety of sources, including popular online retailers like Amazon and Walmart, and at supermarkets and health food stores in New York state, such as the Vitamin Shoppe and Whole Foods Market. Then CR tested samples from multiple lots of each product for total protein, arsenic, cadmium, lead, and other elements."

16.     Pursuant to the study published by Consumer Reports, "more than two-thirds of the products we analyzed a single serving contained more lead than CR's food safety experts say is safe to consume in a day—some by more than 10 times.[6] This included the Products.

17.     In sum, Consumer Reports anonymously purchased from a variety of sources, multiple samples of each product, including two to four distinct lots, over a three-month period

---

[5] https://www.nytimes.com/2025/10/14/well/lead-protein-powder.html (last accessed Dec. 2, 2025)
[6] https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last accessed Dec. 2, 2025)

beginning in November 2024. "Then CR tested samples from multiple lots of each product for total protein, arsenic, cadmium, lead, and other elements."[7]

18.     Consumer Reports found that one serving of the Product contained 6.3 micrograms of lead (approximately 1,290% of Consumer Reports' daily lead limit).[8]

19.     In addition, Consumer Reports found "measurable levels of cadmium and inorganic arsenic in" the Product. Indeed, one serving of the Product "contained 9.2 micrograms of cadmium, more than double the level that public health authorities."[9]

20.     Both independent and third-party testing by consumer groups demonstrate that the Products purchased by Plaintiff are contaminated with lead.

21.     Accordingly, well-established studies, including the Consumer Reports study, and independent test results confirmed and demonstrated wide-spread lead contamination in the Products, including ones purchased by Plaintiff as the products tested were substantially similar and purchased during the same time period as consumer groups' studies.

22.     The levels of lead revealed in the studies are very high considering that the Products are commonly used condiments for families. Indeed, FDA guidelines regarding food safety for children call for a maximum of 10 parts per billion (ppb) for fruits, vegetables (excluding single-ingredient root vegetables), mixtures (including grain- and meat-based mixtures), yogurts, custards/puddings, and single-ingredient meats; 20 ppb for single-ingredient root vegetables; and 20 ppb for dry infant cereals.[10]

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-levels-lead-processed-food-intended-babies-and-young-children (last accessed Dec. 2, 2025)

23.     Defendant uses a marketing and advertising campaign that omits from the ingredients lists that the Products contain lead. This omission leads a reasonable consumer to believe they are not purchasing a product with a known neurotoxin when in fact they are purchasing a product contaminated with lead.

24.     Defendant's marketing and advertising campaign includes the one place that every consumer looks when purchasing a product—the packaging and labels themselves. As such, a reasonable consumer reviewing Defendant's labels reasonably believes that they are purchasing a product that is safe for oral ingestion and does not contain any harmful neurotoxins.

25.     Indeed, consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products. Thus, reasonable consumers would not think that Defendant is omitting that the Products contain, or are at risk of containing, lead.

26.     Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products do contain, or risk containing, lead, which is dangerous to one's health and well-being. Nevertheless, Defendant does not list or mention lead anywhere on the Products' packaging or labeling.

27.     Plaintiff and Class Members relied on Defendant's misrepresentations and omissions of the safety of the Products and what is in the Products when they purchased them.

28.     Consequently, Plaintiff and Class Members lost the entire benefit of their bargain when what they received was a food product contaminated with a known neurotoxin that is harmful to consumers' health.

29.     That is because Defendant's Products containing, or at risk of containing lead, a known dangerous substance, have no value.

30.     As set forth below, food products, such as Defendant's Products, are in no way safe for human consumption and are entirely worthless.

31.     Alternatively, Plaintiff and Class Members paid a price premium for the Products based upon Defendant's marketing and advertising campaign including its false and misleading representations and omission on the Products' labels. Given that Plaintiff and Class Members paid a premium for the Products, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

32.     Accordingly, Defendant's conduct violated and continues to violate, *inter alia*, Florida's Deceptive Unfair Trade Practices Act § 501.204(1). Defendant also breached and continues to breach its warranties regarding the Products. Defendant has been and continues to be unjustly enriched.

33.     Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

34.     Defendant manufactures, markets, advertises, and sells "nutritionally complete, convenient, affordable food, with minimal impact on animals and the environment" including protein powder products.

35.     Consumers have become increasingly concerned about the effects of ingredients in products that they orally ingest. Companies, such as Defendant, have capitalized on consumers' desire for food products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

36.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as lead, especially at the point of sale, and therefore must and do rely on Defendant to truthfully and honestly report what the Products contain or are at risk of containing on the Products' packaging or labels.

37.     The Products' packaging does not identify lead. Indeed, lead is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of lead in the Products. This leads reasonable consumers to believe the Products do not contain, and are not at risk of containing, lead.

38.     However, the Products contain, or are at risk of containing, lead.

39.     Lead is a powerful neurotoxin. There is no safe blood level of lead.[11] Lead consumption has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer.[12]

40.     This is true even at low levels of lead consumption.[13] For example, research has shown that an increase of only 0.3 micrograms/deciliter of median blood lead levels is associated with a doubling of the risk for panic disorder.[14] People exposed to low levels of lead lose an average of 1.37 IQ points per 1 microgram/deciliter increase in blood lead concentration.[15] Ingested lead accumulates in the bones and brain and can cause health problems even decades

---

[11] *CDC – Lead – Tips – Sources of Lead – Folk Medicine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 15, 2013), http://www.cdc.gov/nceh/lead/tips/folkmedicine.htm. (last accessed Dec. 2, 2025)

[12] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure:  A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).

[13] *Id*.

[14] Bouchard, *supra*, at 1317.

[15] Richard L. Canfield, Ph.D et al., *Intellectual Impairments in Children with Blood Lead Concentrations Below 10 Micrograms per Deciliter*, THE NEW ENGLAND JOURNAL OF MEDICINE 1517, 1521 (April 17, 2003)

later.[16] Chronic low dose exposure to lead is believed to be associated with cognitive decline and dementia in older adults.[17]

41.     Children are at especially high risk of developing adverse effects from lead exposure due to their developing brains, and because, compared to adults, less lead is stored by the body in bones and teeth and more in the nervous system.[18]

42.     "Even low levels of lead in blood have been shown to affect a child's learning capacity, ability to pay attention, and academic achievement. The effects of lead exposure can be permanent."[19]

43.     "CDC currently uses a blood lead reference value (BLRV) of 3.5 micrograms per deciliter to identify children with blood lead levels that are higher than most children's levels. This level is based on the on the 97.5th percentile of the blood lead values among U.S. of children ages 1-5 years from the 2015-2016 and 2017-2018 National Health and Nutrition Examination Survey (NHANES) cycles. Children with blood lead levels at or above the BLRV are among the top 2.5% of U.S. children with the highest blood lead levels."[20]

44.     Children found to have a blood lead level greater than 3.5 μg/dL should be reported to state and local health departments which may prompt an investigation of the child's home and environment and regular monitoring.[21]

---

[16] Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Jennifer Weuve et al., *Cumulative Exposure to Lead in Relation to Cognitive Function in Older Women*, 117 ENVIRONMENTAL HEALTH PERSPECTIVES 574, 578 (April 2009).
[17] Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Jennifer Weuve et al., *Cumulative Exposure to Lead in Relation to Cognitive Function in Older Women*, 117 ENVIRONMENTAL HEALTH PERSPECTIVES 574, 578 (April 2009); Bouchard, *supra*, at 1318.
[18] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1314903/ (last accessed Dec. 2, 2025)
[19] https://www.cdc.gov/nceh/lead/docs/lead-levels-in-children-fact-sheet-508.pdf (last accessed Dec. 2, 2025)
[20] https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (last accessed Dec. 2, 2025)
[21] https://www.cdc.gov/nceh/lead/advisory/acclpp/actions-blls.htm (last accessed Dec. 2, 2025)

45.     Children found to have blood levels greater than 20 µg/dL are put on more advanced treatments, including abdominal x-ray, bowel decontamination, chelation therapy, or even admission to a hospital.[22]

46.     Children found to have lead in their blood are recommended to have their levels monitored and potentially enroll in various treatments, including feeding the child a diet high in iron and calcium, x-rays, and chelation therapy to remove lead from their blood.

47.     Defendant is a large and sophisticated corporation that has been in the business of producing, manufacturing, selling, and distributing food products for many years, including producing and manufacturing the contaminated Products.

48.     Defendant is in the unique and superior position of knowing the ingredients and raw materials used in the manufacturing of its Products and possess unique and superior knowledge regarding the manufacturing process of the Products, the manufacturing process of the ingredients and raw materials the Products contain, and the risks associated with those processes, such as the risk of lead contamination, as well as the ability to test the Products for lead contamination prior to releasing the Products into the stream of commerce.

49.     Accordingly, Defendant possesses superior knowledge regarding the risks involved in the production and manufacturing of its Products. Such knowledge is not readily available to consumers like Plaintiff and Class Members.

50.     Defendant has a duty to provide consumers, like Plaintiff and Class Members, with accurate information about the contents of the Products.

---

[22] *Id.*

51.     Therefore, Defendant's false, misleading, and deceptive omissions regarding the Products containing lead are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and Class Members.

52.     Defendant's misrepresentations and omissions were material and intentional because people are concerned with what is in the products that they orally ingest. Consumers such as Plaintiff and the Class Members are influenced by the marketing and advertising campaign, the Products' labels, and the listed ingredients. Defendant knows that if they had not omitted that the Products contained lead, then Plaintiff and the Class would not have purchased the Products at all.

53.     Through its deceptive advertising and labeling, Defendant has violated, *inter alia*, FDUTPA § 501.204(1) by: a) putting upon an article of merchandise, bottle, wrapper, package, label, or other thing containing or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b) selling or offering for sale an article which, to its knowledge, is falsely described or indicated upon any such package or vessel containing the same, or label thereupon, in any of the particulars specified.

54.     Consumers rely on marketing and information in making purchasing decisions.

55.     By omitting that the Products include lead on the labels of the Products throughout the Class Period, Defendant knows that those omissions are material to consumers since they would not purchase a product with a harmful neurotoxin such as lead.

56.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

57.     Plaintiff and Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

58.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and Class Members.

59.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for a product marketed without lead over comparable products not so marketed.

60.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representation and omission, Defendant injured Plaintiff and Class Members in that they:

a.     Paid a sum of money for Products that were not what Defendant represented;

b.     Paid a premium price for Products that were not what Defendant represented;

c.     Were deprived of the benefit of the bargain because the Products they purchased was different from what Defendant warranted;

d.     Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

e.     They ingested a substance that was of a different quality than what Defendant promised; and

f.     Were denied the benefit of the properties of the Products Defendant promised.

61.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and Class Members would not have been willing to pay the same amount for the Products they purchased and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

62.     Plaintiff and the Class Members paid for Products that do not contain Lead.  Since the Products do indeed contain lead, a harmful neurotoxin, the Products Plaintiff and Class Members received were worth less than the Products for which they paid.

63.     Plaintiff and Class Members all paid money for the Products; however, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and  Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

64.     Plaintiff and Class Members read and relied on Defendant's representations about the Products and purchased Defendant's Products based thereon. Had Plaintiff and Class Members known the truth about the Products, i.e., that they contain a harmful neurotoxin (i.e. lead), they would not have been willing to purchase them at any price, or, at minimum would have paid less for them.

## JURISDICTION AND VENUE

65.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members; (2) minimal diversity exists because one or more putative Class Members are citizens of a different state than the Defendant in that numerous members of the putative Class are domiciled in Florida, and Defendant Huel Inc. is a citizen of Delaware; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

66.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the state of Florida, contracts to supply goods within the state of Florida, and supplies goods within the state of Florida.

67.     Venue is proper because Plaintiff and many Class Members reside in the Southern District of Florida, and throughout the state of Florida. A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

**PARTIES**

**Plaintiff**

68.     Plaintiff is a citizen and resident of Broward County, Florida. During the applicable statute of limitations period, Plaintiff purchased and used Defendant's Products that contained lead, including Products that were reported about in the New York Times and subject of the Consumer Reports study referenced above.

69.     More specifically, Plaintiff purchased the Products numerous times throughout the class period from GNC and Target, including purchasing the Huel Black Edition Protein Powder Meal Replacement Shake Chocolate for an approximate retail price of $40.

70.     Plaintiff purchased the Product in the state of Florida and had the product shipped to her home in the state of Florida.

71.     Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the contents of the Products, Plaintiff would not have been willing to purchase the Products. Plaintiff purchased, purchased more of, and/or paid more for, the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worthless because they contain the known harmful neurotoxin, lead. Alternatively, Plaintiff paid a price premium based on Defendant's false, misleading, and deceptive misrepresentations and

omissions. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

71.     Upon information and belief, Defendant, Huel Inc., is a subsidiary of U.K.-based Huel Limited, is a Delaware corporation, and has a principal place of business in Brooklyn, New York.

72.     Defendant manufactures, markets, advertises, and distributes the Products throughout the United States. Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of its Products.

## CLASS ALLEGATIONS

73.     Plaintiff brings this matter on behalf of herself and those similarly situated. As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices. Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

74.     The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

75.     Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of Florida at any time during the Class Period (the "Florida Subclass").

76.     The Class and Florida Subclass are referred to collectively throughout the Complaint as the Class.

77.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

78.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers in the Class and the Florida Class who are Class Members as described above who have been damaged by Defendant's deceptive and misleading practices.

79.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.     Whether Defendant was responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.     Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

c.     Whether Defendant made false and/or misleading statements and omissions to the Class and the public concerning the contents of its Products;

d.     Whether Defendant's false and misleading statements and omissions concerning its Products were likely to deceive the public; and

e.     Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

80.     <u>Typicality</u>: Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same

deceptive, misleading conduct and purchased Defendant's Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

81.    <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seeks to represent, her consumer fraud claims are common to all members of the Class, she has a strong interest in vindicating her rights, she has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

82.    <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

83.    <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

    a.    The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

    b.    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

    c.    When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far

less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.      This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.      Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude their maintenance as a class action;

f.      This class action will assure uniformity of decisions among Class Members;

g.      The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

i.      It would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendant's uniform false advertising to purchase its Products.

84.      Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF FLORIDA DECEPTIVE UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. §§ 501.201, *et seq.*)
### (On Behalf of Plaintiff and Florida Subclass Members)

85.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

86.     Section 501.204(1) of the FDUTPA declares that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

87.      "Trade or commerce" means the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Section 501.203(8).

88.     The provisions of FDUTPA shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce." *See* Section 501.202.

89.     Defendant's conduct as described herein is in violation of section 501.204(1) of the FDUTPA in that Defendant engaged in unfair and deceptive acts and practices by advertising, soliciting, providing, offering, and distributing the Products as suitable for consumption, when in fact the Products contain the harmful neurotoxin lead.

90.     Defendant deceptively and misleadingly conceals and misrepresents material facts about the Products, including: (a) the true nature of the Products' ingredients and (b) that the Product contained lead.

91.     Plaintiff and the Florida Subclass seek all relief available under the FDUTPA.

## SECOND CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (On Behalf of Plaintiff and All Class Members)

92.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

93.    Defendant provided Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are safe for use and do not contain lead.

94.    Defendant omitted that the Products contain a known neurotoxin from its ingredients labeling. This omission would lead reasonable consumers did not contain a known neurotoxin, when in fact, the Products were contaminated with Lead as stated herein.

95.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

96.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff and Class Members' transactions.

97.    Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

98.    Defendant knowingly breached the express warranties by including lead in the Products sold to Plaintiff and the Class without properly notifying them of its inclusion in the Products.

99.    Within a reasonable time after it knew or should have known, Defendant did not change the Products' labels to include lead in the ingredients list or to otherwise warn consumers that the Products contain, or are at risk of containing, lead.

100.    Defendant thereby breached the following state warranty laws:

    a.      Code of Ala. § 7-2-313;

    b.      Alaska Stat. § 45.02.313;

    c.      A.R.S. § 47-2313;

    d.      A.C.A. § 4-2-313;

    e.      Cal. Comm. Code § 2313;

    f.      Colo. Rev. Stat. § 4-2-313;

    g.      Conn. Gen. Stat. § 42a-2-313;

    h.      6 Del. C. § 2-313;

    i.      D.C. Code § 28:2-313;

    j.      Fla. Stat. § 672.313;

    k.      O.C.G.A. § 11-2-313;

    l.      H.R.S. § 490:2-313;

    m.      Idaho Code § 28-2-313;

    n.      810 I.L.C.S. 5/2-313;

    o.      Ind. Code § 26-1-2-313;

    p.      Iowa Code § 554.2313;

    q.      K.S.A. § 84-2-313;

    r.      K.R.S. § 355.2-313;

    s.      11 M.R.S. § 2-313;

    t.      Md. Commercial Law Code Ann. § 2-313;

    u.      106 Mass. Gen. Laws Ann. § 2-313;

    v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.   Va. Code Ann. § 59.1-504.2;

uu.   Wash. Rev. Code Ann. § 6A.2-313;

vv.   W. Va. Code § 46-2-313;

ww.   Wis. Stat. § 402.313; and

xx.   Wyo. Stat. § 34.1-2-313.

101.   As a direct and proximate result of Defendant's breach of the express warranties, Plaintiff and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and All Class Members)**

102.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

103.   Plaintiff, on behalf of herself and consumers nationwide, brings a claim for unjust enrichment.

104.   Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling their Product while misrepresenting and omitting material facts.

105.   Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling their Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members, and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

106.    Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

107.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class Members' overpayments.

108.    Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a)    Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b)    Awarding monetary damages and treble damages;

(c)    Awarding statutory damages per transaction pursuant to FDUPTA § 501.204(1);

(d)    Awarding punitive damages;

(e)    Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

(f)    Granting such other and further relief as the Court may deem just and proper.

Dated: December 5, 2025

**LEEDS BROWN LAW, P.C.**

_/s/  Brett R. Cohen_____
Brett R. Cohen, Esq.
One Old Country Road, Suite 347
Carle Place, NY 11514
(516) 873-9550
bcohen@leedsbrownlaw.com

*Counsel for Plaintiff and Proposed Class*